**James E. JONES, Petitioner,**

v.

**STATE OF WISCONSIN, Respondent.**

**Civ. A. No. 73-C-337.**

United States District Court,
E. D. Wisconsin.

Dec. 1, 1976.

Charlene R. Bohl, Atty., Post-Conviction Defense Project, Madison, Wis., for petitioner.

John M. Schmolesky, Asst. Atty. Gen., Madison, Wis., for respondent.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

This petition for issuance of a writ of habeas corpus is before the court to review the petitioner's claim that the identification procedures employed by the Kenosha police at their stationhouse were so unnecessarily suggestive and conducive to irreparable misidentification that the use of the in-court identification constituted a denial of due process. For the reasons hereinafter stated, the petition is denied.

On October 22, 1971, the petitioner was arraigned and entered a plea of not guilty to the charge of armed robbery (masked) in violation of §§ 943.32(1)(b) and (2) and 946.-62, Wis.Stats. (1969). On December 1, 1971, the trial court held a *Wade* hearing on petitioner's motion to suppress all of the identifications made by the witnesses James Gallo and Georgia Lindow. On January 27, 1972, the trial court held that the police station identifications of the petitioner by Gallo and Lindow were based on unconstitutionally suggestive show-ups, and, because petitioner was not represented by counsel or informed of his right to counsel at the show-ups, the out-of-court identifications of the petitioner should be suppressed. However, the court found the in-court identifications were based on their observation of the petitioner at the alleged robbery and, therefore, denied the petitioner's motion to suppress the in-court identifications.

On February 21, 1972, the petitioner moved to change his plea from not guilty to guilty, subject to his right to appeal the denial of the suppression motion, pursuant to § 971.31(10), Wis.Stats. Petitioner's plea of guilty was accepted, and he was later sentenced to a term of fourteen years at the Wisconsin State Prison at Waupun.

The petitioner appealed his conviction, and in *Jones v. State*, 59 Wis.2d 184, 207 N.W.2d 890 (1972), the Wisconsin Supreme Court affirmed the trial court's denial of the motion to suppress the in-court identifications.

On June 25, 1973, the petitioner filed with the district court a *pro se* petition for a writ of habeas corpus. The petition was denied by an opinion and order of Judge Robert E. Tehan on December 6, 1973. The Court refused to consider petitioner's claim that the in-court identifications by Gallo and Lindow were tainted by illegal police station identifications on the ground that by pleading guilty petitioner had waived the right to review by a writ of habeas corpus constitutional defects antedating the plea.

On appeal, the Seventh Circuit Court of Appeals, in an unpublished opinion, reversed and remanded for a review of the petitioner's claim that the stationhouse show-ups were tainted and to make findings on them accordingly.

The facts concerning the identifications of the petitioner appear from the transcripts of the pertinent state court hearings.

The Gallo Pharmacy in Kenosha, Wisconsin, was robbed by three masked men on July 17, 1971, at about 5:30 P.M. The challenged identification evidence was given by two eye witnesses to the robbery, Georgia Lindow, a pharmacy employee, who testified at the preliminary hearing and the hearing on the motion to suppress, and James Gallo who testified at the hearing on the motion to suppress only.

The transcripts show that Lindow was in a back room at the pharmacy when she heard someone saying, "This is a holdup." A man with a gun opened the door to the back room, grabbed her arm, and told her to lie on the floor with her hands stretched out in front of her. When she lifted her head, the man she identified as the petitioner was kneeling at a distance of less than

ten feet from her. He pointed a gun at her and told her to put her head down. He looked at her directly for some thirty to forty seconds. The lighting conditions were good. Lindow observed that the robber was masked, which mask covered his face from the nose down, and that he wore a hat with a floppy brim that seemed to be pushed back. She particularly noted the man's wide forehead and high cheekbones.

Gallo observed at least one robber behind the pharmacy during the course of the robbery. At the time he made the observation, Gallo was no more than one foot from the robber, and since it was still daylight, the lighting conditions were good. Gallo noted the robber's size, build, dark clothing, hat, facial features, and, in particular, his high cheekbones.

Within a week of the robbery, on July 21, and on or about July 22, 1971, both eye witnesses, independently, at different times and in different places, were shown photographs of eight black males. Gallo identified two of the photographs as those of two of the men involved in the robbery. He identified that of the petitioner as a probable suspect and stated that he thought, to the best of his knowledge, that this was the man as he remembered him from the day of the robbery.

Lindow identified the photograph of the petitioner as showing the man who had told her to keep her head down. She stated that the photograph resembled the man but that she was not positive.

The show-ups occurred after these photographic identifications. It should be noted that the petitioner is challenging only the show-ups as unconstitutionally suggestive, not the photographic identifications.

Sometime between July 26, and July 30, 1971, Gallo and Lindow viewed the petitioner through a one-way mirror at the Kenosha police department. The petitioner was the only suspect and the only black man in the room. He was accompanied by at least one police officer. Prior to the viewing, Gallo and Lindow discussed the robbery. Gallo viewed the petitioner first and, in the presence of Lindow, identified the petition-

er as being, to the best of his knowledge, the man he saw July 17, 1971. Lindow still was not positive that the petitioner was the man she had seen at the store and asked if she might hear his voice.

Gallo and Lindow listened to a tape recording of the conversation petitioner and a detective had while petitioner was being viewed through the one-way mirror. Lindow was still unable to make a positive identification after hearing the tape recording, and she requested to see the petitioner again.

On July 30, 1971, petitioner was brought into a room in the city jail in which Lindow was seated. A detective offered petitioner a cigarette and told him to sit across from Lindow. Petitioner sat down about four feet from Lindow, facing her. In her presence, the detective told petitioner to say something that was said at the robbery, and petitioner did so. Then the detective engaged petitioner in a discussion about a lie detector test petitioner had taken and informed petitioner he had flunked the test. After listening to and observing some further conversation between petitioner and the detective, Lindow identified the petitioner as the robber. At that confrontation, the petitioner was the only black man in the room, and he was the only person asked to repeat what was said at the robbery. Lindow testified that petitioner's voice was the only one she was ever asked to listen to for identification purposes.

Both witnesses made positive in-court identifications of the petitioner, principally relying on the petitioner's facial characteristics: his eyes, forehead, bridge of the nose, and cheekbones. Gallo also remembered the petitioner by his build and size and testified that nothing changed his opinion since his identification of the photographs he had been shown initially.

After viewing the petitioner at the police station but before the in-court identification, Gallo and Lindow went to Racine to view a line-up. At that line-up, Gallo identified a man other than petitioner as one of the robbers. The petitioner was not included in the line-up.

On the basis of these facts, the petitioner argues that under the totality of the circumstances test of *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and of *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the identification procedure in the petitioner's case was so unnecessarily suggestive and conducive to irreparable mistaken identification that the use of the in-court identification constituted a denial of due process.

The Seventh Circuit identified three interrelated aspects of the "totality of the circumstances" which must be considered in cases challenging identification procedures. *United States ex rel. Kirby v. Sturges*, 510 F.2d 397 (7th Cir. 1975); *Israel v. Odom*, 521 F.2d 1370 (7th Cir. 1975). The Court in *Israel* said at 1373:

> " * * * First, the court must determine whether the police procedures at issue in the case were, in fact, suggestive. If such suggestiveness is found, the court must next consider whether any unusual or exigent circumstances existed which might, at least in part, have justified the use of the faulty procedures. Finally, and most critically, the court must examine the reliability of the identification, in spite of the suggestive nature of the confrontation. It is clear that the reliability issue is the determining factor in this examination and unjustified, suggestive procedures may be overborne when there are present sufficient indicia of reliability. * * * "

The Court will examine the challenged show-ups in the manner outlined in *Israel*.

 There is no doubt that the procedures employed by the Kenosha police at their stationhouse were suggestive. At the first show-up, attended by both Gallo and Lindow, the petitioner was the only black man to be viewed by the witnesses. Also, Gallo and Lindow were allowed to discuss the robbery before viewing the petitioner and viewed the petitioner together. In *United States ex rel. Pierce v. Cannon*, 508 F.2d 197, 201 (7th Cir. 1974), the Court said: " * * * [T]here would seem to be no excuse for allowing a procedure which permits two or more witnesses to discuss their identifications."

At the second show-up, attended only by Lindow, the petitioner was the only black man in the room and the only man required to repeat the words used at the robbery. In addition, a detective informed the petitioner in front of Lindow that he had flunked his lie detector test.

At both the show-ups, the petitioner was singled out and, particularly at the second show-up, was identified as under suspicion by the police.

There were no exigent circumstances justifying the use of the challenged procedures. *Stovall*, supra, and *Neil*, supra, were instances in which the Court found exigent circumstances. In *Stovall*, the accused was subjected to a suggestive one-to-one confrontation at a hospital with the only witness to the crime because of the critical condition of the witness and the consequent need for an immediate identification. In *Neil*, the police conducted a suggestive show-up but only after having made unsuccessful efforts to find men who could approximate the accused's peculiar build.

In the petitioner's case, there is nothing on the record indicating a need for him to be subjected to a one-to-one confrontation with the witnesses. Nor is there any indication on the record that the Kenosha police made any attempt, much less an unsuccessful one, to find other individuals with characteristics approximating the petitioner's for purposes of conducting a line-up. The record demonstrates only that the Kenosha police conducted suggestive show-ups.

This brings the Court to the determining factor in the "totality of the circumstances" test, the reliability of the witnesses' identifications.

The Court in *Israel*, supra, stated that *Neil*, supra, provides the considerations for determining the issue of reliability. The Court in *Neil* said:

> " * * * [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity

**1152**

of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. * * * " 409 U.S. at 199–200, 93 S.Ct. at 382.

■ The Court will examine first the identification by Lindow, then the identification by Gallo in light of the *Neil* test. Also, since the issue is the reliability of the in-court identification of the petitioner by the two witnesses, the Court will take into consideration the photographic identifications as well as the identifications made at the show-ups.

It is manifest that the in-court identification of the petitioner by Lindow is not reliable. Although Lindow had a good opportunity to view the robber, demonstrated a degree of attention sufficient to provide a reasonably good description of the criminal, and made a positive identification of the petitioner as the robber within two weeks of the robbery, the level of certainty she demonstrated at the confrontations is fatal to her reliability. At the photographic identification, Lindow stated she was not positive that the photograph of the petitioner was the same as that of the robber. At the first show-up, she indicated that she wanted to see the petitioner again and, in addition, requested an opportunity to hear his voice. It was not until the second show-up, after the police had told the petitioner, in Lindow's presence, that he had flunked his lie detector test, that Lindow made a positive identification of the petitioner as the robber. By this time, the suggestiveness of the identification procedures was so pervasive that it is doubtful whether Lindow could have made an independent determination that the petitioner was one of the robbers.

■ The same defects do not attach to the identification of the petitioner by Gallo. Gallo had ample opportunity to view the criminal at the time of the crime. He was within a foot of the robber for approxi-

mately sixty seconds in broad daylight. There is nothing in the record to indicate that his attention was in any way distracted from the robber. His reasonably detailed description of the size, build, clothes, and facial features of the robber prior to the suggestive show-up in which he participated indicated that he had a good look at the robber. He first identified the petitioner as the robber at a photographic presentation within one week of the robbery. At the photographic presentation, Gallo identified the petitioner as the robber to the best of his knowledge and made the same identification at the show-up before Lindow had viewed the petitioner and had any opportunity to influence him. The fact that Gallo qualified his identifications does not necessarily connote uncertainty or equivocacy, but may indicate a "natural and proper caution" to avoid misidentification of an innocent person. *Israel v. Odom*, 521 F.2d 1370, 1376 (7th Cir. 1975).

■ The only challenge to the reliability of Gallo's identification is the fact that he identified an individual other than the petitioner at a line-up conducted in Racine. This, however, is not fatal to Gallo's identification. First, there was more than one robber. Gallo did not indicate that he saw only one robber and, in fact, picked two photographs at the photographic presentation as showing two of the men involved in the robbery. Second, the petitioner was not present in that line-up and therefore was not passed over by Gallo in favor of another. Taken together with the certainty of his identification of the petitioner prior to the suggestive show-up, Gallo's in-court identification of the petitioner is not rendered unreliable by the identification at the Racine line-up.

For the foregoing reasons,

IT IS ORDERED that the petition of James E. Jones for a writ of habeas corpus is DENIED.